UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

ALAN LOREFICE,

       Plaintiff,

vs.

STATE OF NEW YORK, DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,

       Defendants.

**COMPLAINT**

**1:21-cv-01367 (MAD/CFH)**

-------------------------------------------------------------------------x

    Through his counsel, Michael H. Sussman, Esq., plaintiff Alan Lorefice hereby states as and for his Complaint of unlawful discrimination against defendants

### I. PARTIES

1. Plaintiff Alan Lorefice worked for the Defendants between 2000 and his termination on or about November 2020 as a biologist. He currently resides outside of this judicial district.

2. Defendants State of New York and DEC are plaintiff's joint employers. They employ more than twenty people. Both defendants conduct business in this jurisdiction.

### II. JURISDICTION

3. Within 300 days of the termination of his employment, plaintiff filed a charge of unlawful discrimination based upon his gender with the EEOC. Exhibit 1 hereto

4. On October 26, 2021, the United States Department of Justice issued plaintiff a right to sue letter. Exhibit 2 hereto.

1

5. This Honorable Court has jurisdiction over this action pursuant to 42 U.S.C. section 2000e-5, et seq. and 42 U.S.C. section 1988.

III. **STATEMENT OF FACTS**

6. In or about November 2019, defendant DEC suspended plaintiff from work and charged him with sexual harassment against another DEC employee referred to herein as D.K.

7. Plaintiff denied the disciplinary charges propounded against him and the matter proceeded to an arbitration.

8. On November 12, 2020, the arbitrator found plaintiff guilty of the majority of charges propounded against him, not guilty of several of the charges and recommended the termination of his employment on the ground that he was irredeemable and could not alter his conduct.

9. Within two days, the Defendants adopted this reasoning and terminated plaintiff's employment.

10. Plaintiff did not challenge his termination through an Article 78 proceeding and instead initiates this proceeding.

11. Plaintiff contends that this termination was itself a violation of Title VII of the Civil Rights Act of 1964, a stereotypic response to conduct which [a] he did not engage in at the workplace or during work hours, [b] did NOT interfere with D.K.'s job performance or [c] disrupt the workplace.

12. Instead, defendants' terminated plaintiff to show fake solidarity with the "me too" movement, while the Chief Executive Officer of the State of New York was groping women and engaging in intentional acts of sexual harassment.

13. In late 2018, plaintiff invited D.K. on a hike via a message he sent to her Facebook account after work hours and never discussed this with her at work.

14. Plaintiff is an avid hiker and thought D.K. might enjoy the activity.

15. D.K. declined in a polite manner which did not give plaintiff and would not have given any reasonable person the impression that she wished no further contact with him or that his contact had offended her in any way.

16. At the time plaintiff invited D.K. on this hike, they worked in different sections of the DEC, did not collaborate on projects, and did not hang out at work.

17. Plaintiff invited D.K. on the hike based on his sense that she was a fine person and someone he wanted to get to know better.

18. After D.K. declined to go on this hike, plaintiff made no contact with her through the winter 2019.

19. Plaintiff did continue to see D.K. around the DEC building, did never hassled her in any manner.

20. At the same time, plaintiff did develop affectionate feelings toward D.K. despite the substantial age difference between them.

21. In April 2019, informed by these developing feelings, plaintiff began sending virtual messages to D.K.'s facebook account

22. Plaintiff did not do this during work hours and did not use his work equipment to do so.

23. Plaintiff continued periodically sending D.K. messages through early October 2019.

24. D.K. never responded to any of plaintiff's messages.

25. D.K. never told plaintiff to stop sending messages.

26. Plaintiff lacked knowledge as to whether D.K. was or was not receiving his messages, but this did not alter his feelings for her.

27. During the months plaintiff sent D.K. these messages, he rarely interacted with D.K. at work.

28. Plaintiff was never D.K.'s her superior nor collaborator on any work-related project.

29. Indeed, plaintiff and D.K. had nothing to do with each other at work and their assignments and responsibilities did not overlap.

30. Plaintiff played no role in supervising D.K. and had absolutely no impact on any job performance ratings she received.

31. In the early fall 2019, D.K. sponsored an after-work party off DEC premises.

32. D.K. invited plaintiff to this event and solicited his material contributions.

33. In response, plaintiff baked pies for the event.

34. At the event, D.K. and plaintiff interacted unremarkably, and plaintiff engaged in no behavior which D.K. viewed [or could reasonably be viewed] as sexual or romantic in nature.

35. D.K. made no complaint to anyone about plaintiff's conduct at this event.

36. To thank her for arranging this party, plaintiff baked D.K. a quiche and brought it to her workspace.

37. D.K. explained she had other lunch plans and plaintiff then put the quiche in a refrigerator at work.

38. Again, during this interaction, plaintiff made no sexual comments or gestures of any sort.

39. Shortly after this event, D.K. was at a bar with some friends and mentioned plaintiff's name.

40. One of D.K.'s friends asked to see plaintiff's photograph.

41. D.K. then searched her phone and found plaintiff's many messages, sent between April 2020 and early November 2020.

42. These messages did express plaintiff's feelings of affection toward D.K. and proposed a life together.

43. Plaintiff's messages were not sexual in content and contained no offensive photos or images.

44. Seeing plaintiff's messages all at once overwhelmed D.K. and made her feel uncomfortable.

45. D.K. reported the messages to her supervisor, and defendants immediately suspended plaintiff and escorted him unceremoniously from the DEC building without giving him any chance to explain his side of the story.

46. In December 2019, as she had planned and told Plaintiff she intended to do at the September party, D.K. left the DEC in or about January 2020 to pursue graduate studies at Cornell University.

47. D.K. had announced her intent to do so months before and DEC knew of her intent to leave when it suspended plaintiff.

48. At his disciplinary hearing, Defendants claimed that plaintiff had demonstrated a pernicious pattern of pursuing women he met at the workplace.

49. Several years earlier, plaintiff had been interested in another female employee, E.R.

50. After E.R. left the DEC, she sought an assurance from administration that if she returned, plaintiff would not pursue her.

51. In fact, plaintiff had never engaged in any inappropriate conduct toward E.R. at the workplace and desisted from any out-of-work communication with her upon being advised by DEC's then Affirmative Action officer, Juan Abadia, that she did not appreciate his communications with her.

52. If anything, this prior instance demonstrates that when told of another's feelings, plaintiff respected them.

53. D.K. never expressed to plaintiff any discomfort with his communications with her.

54. Had D.K. done so, plaintiff would have desisted from any communication with her.

55. Plaintiff never engaged in any conduct which could reasonably be construed as sexual harassment toward D.K. at the workplace.

56. Plaintiff did not know his unread communications with D.K. were unwelcome.

57. Plaintiff did not disrupt or interfere with D.K.'s work and never attempted to do so in any way.

58. Plaintiff never initiated any physical or sexual contact with D.K.

59. Plaintiff never subjected D.K. to humiliation, insults, or pressure.

60. The conclusion that plaintiff engaged in unwelcome communication toward D.K. is false because D.K. never conveyed to plaintiff that his communications were unwelcome and, by own her account, she was not aware of plaintiff's messages to her until she happened upon them in a bar in October 2019.

61. Upon so stumbling upon these communications, D.K. did not contact plaintiff and tell him to stop.

62. Rather, she brought these private communications which occurred outside of the workplace into the workplace, something plaintiff had not done.

63. Defendants' discipline of plaintiff represents a gender stereotypic response, one which assumes that, as a male, plaintiff is aggressive and could not control himself and eliminates the requirement that a person offended by an expression of interest expressly indicate as much before the person expressing such interest may fairly be accused of sexual harassment.

64. This stereotype is a form of gender bias as is the presumption that a female is timid and unable to speak up for herself.

65. Had D.K. told plaintiff that his communications were unwelcome, he would have stopped them, but she did not.

66. As a direct result of defendants' sex discrimination and stereotyping, they terminated plaintiff in violation of Title VII of the Civil Rights Act of 1964.

67. Plaintiff did not engage in prohibited sexual harassment against D.K.

68. Plaintiff did not create a hostile work environment for D.K. and, instead had almost no contact with her at work and, if directed to have none, would have complied with that direction, understanding her feelings.

69. But, no one so directed him.

70. Plaintiff also did not engage in any form of quid pro quo sexual harassment because he was never in a supervisory or quasi-supervisory position with respect to D.K. and never withheld or threatened to withhold any workplace benefit in exchange for sexual favors.

71. Finally, to the extent the Defendants claim plaintiff disrupted D.K.'s workplace, this allegation is bereft of any factual support.

72. D.K. was unaware of plaintiff's communications with her and when she became aware of them could simply have told me to stop.

73. A person has no right to a workplace free of people who have feelings for him or her.

74. D.K. had no such right though she certainly had the right to a workplace which was not hostile; plaintiff's unread expressions of affection did not create any such hostility for D.K.

75. By dint of Defendant's discriminatory and stereotypic treatment of him, plaintiff has been seriously injured: he lost his long-time job, the salary and benefits associated with it and,

most critically, substantial pension benefits and the likelihood of a promotion, and suffered emotional distress and humiliation and loss of reputation.

IV. **AS AND FOR A FIRST CAUSE OF ACTION**

76. Plaintiff incorporates paras. 1-75 as if fully restated herein.

77. By terminating his employment on the basis of gender-based stereotypes and the false claim that he engaged in sexual harassment, defendants discriminated against plaintiff on account of his gender in violation of 42 U.S.C. section 2000e-5.

V. **PRAYER FOR RELIEF**

**WHEREFORE**, this Honorable Court should accept jurisdiction over this matter, empanel a jury to hear and decide plaintiff's claims and his entitlement to non-economic, compensatory damages, should award plaintiff front and back pay and attorney's fees and reasonably incurred litigation costs and expenses pursuant to 42 U.S.C. action 1988 and enter any other relief warranted by law and equity.

DATED: December 21, 2021

Respectfully submitted,

Michael H. Sussman (103224)

SUSSMAN & ASSOCIATES
PO BOX 1005
GOSHEN, NEW YORK 10924
(845)-294-3991
(845)-294-1623 (Fax)
Sussman1@sussman.law

9